In the

# United States Court of Appeals
### For the Seventh Circuit

————————

No. 06-3910

ENVIRONMENTAL BARRIER CO., LLC,

*Plaintiff-Appellee,*

*v.*

SLURRY SYSTEMS, INC.,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 0212—**Rebecca R. Pallmeyer**, *Judge.*

————————

ARGUED SEPTEMBER 17, 2007—DECIDED AUGUST 29, 2008

————————

Before FLAUM, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* After an arbitration hearing to resolve a construction contract dispute between Environmental Barrier Company ("EBC") and Slurry Systems, Inc. ("SSI"), Arbitrator Franklin I. Kral issued an award in favor of EBC in the amount of $388,919.88. When SSI did not pay, EBC filed suit in Illinois court to confirm the award, and SSI responded by removing the case to the U.S. District Court for the Northern District of Illinois. SSI

urged the district court to vacate the arbitral award, or in the alternative, to modify it. The district court did neither: instead, it confirmed the award entered by Arbitrator Kral. In the course of doing so, the court held that EBC had "standing" to enforce the arbitration clause in the contract and that the arbitrator had not exceeded his powers. On appeal, SSI is now urging us to find that EBC never obtained the right to enforce the contract's arbitration clause. SSI's appellate briefs present this argument as a challenge to arbitrability, based on the fact that SSI agreed to arbitrate only with EBC's predecessor-in-interest, not with EBC itself. This is a major shift from the way SSI presented its case first to the arbitrator and later to the district court, where it framed the issue in terms of EBC's standing to pursue this arbitration. The difference is crucial—indeed, on these facts, fatal—to SSI's claim.

## I

On February 29, 2000, the U.S. Army Corps of Engineers entered into a contract with SSI for work on a project to reduce flooding during heavy rains. The McCook Reservoir Project, as it was called, involved the construction of a multibillion-gallon reservoir; SSI won the right to build the overburden cutoff wall. SSI in turn subcontracted part of its work to an entity called Geo-Con, Inc., using a form contract that the parties signed in April 2000. The parties' briefs recount in detail the progress of SSI's and Geo-Con's work from 2000 to 2003; we include only the facts pertinent to this appeal.

Attachment A to the SSI/Geo-Con subcontract elaborated on Article 8.1 of the text, specifying that "Contractor and Subcontractor shall jointly work together to perform all of the work together [*sic*] to minimize the overall cost of the work." Attachment A also included a longer version of Article 10.1, which described how the parties would allocate revenues, costs, profits, and loss and gave guidance for a final settling-up based on the actual distribution of costs. The subcontract also contained an exclusivity clause, Article 1.3; a broad arbitration clause covering "[a]ny claim arising out of or related to this Subcontract," Article 6.2; and a clause restricting assignment or sub-subcontracting, Article 7.4.2.

The project's scope and methodology changed as the work proceeded, requiring the Corps at one point to suspend operations while it figured out an alternative way to finish the project. Once the modifications to the Prime Contract were in place, SSI and Geo-Con resumed their joint effort to complete their portion of the work. By April 2003, they were finished with their construction work. What remained to be done was the final reckoning of who owed whom how much; this proved to be more difficult. There were, for instance, several pending change orders, and it was unclear how costs and profits would be shifted among the parties. To the extent that these financial details are relevant, we return to them later.

EBC entered the picture in September 2003, when Geo-Con, for reasons unrelated to the McCook project, filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York. During Geo-Con's reorga-

nization, EBC (through two intermediary entities) acquired substantially all of Geo-Con's assets for a purchase price of $2.1 million. The bankruptcy court found that EBC was the only qualified purchaser of Geo-Con's assets. In an order dated April 16, 2004, the court approved the sale in accordance with the terms set forth in a letter from the intermediaries. Part II of the offer letter addressed the Geo-Con acquisition and set forth a list of "excluded assets." The exclusions included "[a]ll contracts for services to be performed by Geo-Con, *except* . . . P90099 McCook, IL" (emphasis added). In other words, the McCook contract was acquired by the intermediary, and then passed along to EBC. There was a Schedule A to the offer letter that listed equipment loans and leases. This was the "Schedule A" to which the bankruptcy court referred when it said in its order that the contracts listed in Schedules A and C were executory.

The sale of the McCook contract was later reflected on Schedule D to the April 29, 2004, bill of sale between Geo-Con and EBC that carried out the bankruptcy court's order. The bill of sale provided that Geo-Con was selling "all of Seller's accounts receivable (including without limitation the accounts set forth on Schedule A hereto)," and "contracts" specified as the "Assumed Contracts." This was a different "Schedule A" than the one attached to the offer letter mentioned in the bankruptcy court's April 16 order. Schedule A to the bill of sale lists accounts receivable and contracts that EBC was acquiring, and it includes the McCook project. Thus, the fact that the bankruptcy court had described the contracts listed in Schedules A and C as executory has little bearing on this case.

SSI asserts that it was not aware of Geo-Con's bank-ruptcy proceedings as they were taking place. It learned about them, however, no later than June 17, 2004, when EBC notified SSI by letter that EBC had succeeded to Geo-Con's rights under the subcontract. The letter contained a demand that SSI pay EBC the balance due to Geo-Con for the work that Geo-Con had performed under the subcontract. At the time, EBC believed that this balance was $711,000. (It later found out that SSI had received two additional payments from the Corps that it had not disclosed, totaling $425,951.38; the discrepancy is im-material for our purposes.)

EBC's June 2004 letter also noted that the "subcontract between Geo-Con and Slurry Systems calls for mediation and arbitration of disputes," but it added that

> EBC's preference is to resolve its claim against Slurry Systems amicably, if possible, without the expenditure of mediation fees and expenses which, pursuant to the contract, are to be shared equally by the parties. Accordingly, we request an opportunity to meet with you within the next two weeks to discuss and hope-fully resolve EBC's claim. If you are unwilling to meet with us within that time, EBC will commence media-tion and arbitration proceedings.

SSI did not respond positively to EBC's letter. On July 7, 2004, SSI's attorneys sent a letter to EBC's counsel, express-ing the opinion that "all disputes between Geo-Con and Slurry Systems have been resolved," and adding that, "[a]s a matter of fact, Geo-Con actually owes Slurry Systems, but because of Geo-Con's liquidation, there is no point in

Slurry pursuing the matter." SSI's letter noted EBC's statement that the subcontract between Geo-Con and SSI "calls for the mediation and arbitration of disputes," and requested that EBC provide SSI "with a copy of the subcontract if you still plan to pursue this matter[.]"

EBC did pursue the matter. After mediation efforts failed, EBC's counsel called SSI's counsel to discuss arbitration. The following week, in a letter dated March 16, 2005, counsel for SSI wrote the following note to EBC's attorney:

> As I stated on the phone, while I am pleased to resolve potential procedural issues by agreement, the first order of business is to determine whether your client, [EBC,] has any standing to arbitrate its claim against our client, [SSI].
>
> You have agreed that invoking the arbitration clause in [Geo-Con's] subcontract with SSI goes hand-in-hand with EBC fully assuming that subcontract. That requires EBC to perform fully all obligations imposed upon Geo-Con by the subcontract, which it has not yet done. Additionally, SSI has not even consented to EBC's assumption of the subcontract, and is unaware of EBC's technical expertise or level of capitalization, or its ability to perform work under the subcontract. Under these circumstances, SSI may be excused from accepting performances from EBC under 11 U.S.C. § 365(c) and other applicable laws.

The letter went on to state that it was "therefore essential that EBC provide SSI with adequate assurances that it can perform its obligations under the subcontract before

EBC can assume the subcontract." Specifically, it demanded (1) that EBC confirm that it "is in the construction business and can handle any remedial work necessary under the subcontract"; (2) that EBC "provide SSI with the insurance and performance bond required by the subcontract"; and (3) that EBC give SSI its "financial data and biographical information," so that SSI could "make an informed decision regarding whether or not to withhold SSI's consent from the proposed assumption." It added that "[t]hese issues need to be resolved now, and not in the context of an arbitration." The letter closed by warning that if it should turn out that Geo-Con's work was "defective in any way, SSI will hold EBC accountable."

The issues were not resolved, and instead EBC filed its demand for arbitration a month later, on April 20, 2005. The demand briefly explained the background of the parties' dispute and the basis for EBC's claim against SSI. EBC argued that SSI owed EBC "at least $657,273.50" and that SSI had "breached the Subcontract by failing to pay that amount."

At that critical juncture, SSI said nothing about the basic arbitrability of the dispute. Instead, it filed an Answering Statement on May 9, 2005. In the box on the Answering Statement form labeled "RESPONDENT ANSWERS CLAIMANT DEMAND FOR ARBITRATION AS FOLLOWS," SSI wrote: "EBC seeks additional moneys under a subcontract which has been paid in full; Respondent [SSI] denies any money is due and seeks return of overpayments and declaratory relief." The "DOLLAR

AMOUNT OF CLAIM" was listed as "To be determined," and in the box labeled "OTHER RELIEF SOUGHT," SSI stated its claim for "A declaration that EBC assumed the subcontract and is in breach of its non-monetary terms; an accounting of money to be paid under the subcontract and a return of any over payments." Notably, SSI did not merely answer EBC's claim; it also filed a counterclaim.

SSI elaborated on its position in a supplementary letter to Arbitrator Kral on June 20, 2005. The letter, which SSI sent "[i]n order to facilitate our June 21, 2005 preliminary hearing," first explained that the disputes "center around a construction subcontract" between SSI and Geo-Con to build a slurry wall for the Corps. It then launched directly into the dispute over payment, providing Arbitrator Kral with SSI's version of how the parties had agreed to allocate the costs and profits. Next, the letter stated that "Geo-Con abandoned the Project before it was over," and so while "EBC now seeks an additional $657,274 . . ., strict application of the payment terms does not require SSI to pay the unearned windfall EBC seeks. Instead, it requires EBC to pay SSI several hundred thousand dollars in overpayments." The remaining three paragraphs expanded on why EBC owed money to SSI. There is not even a passing reference to a defense of lack of arbitrability.

Three days after the preliminary hearing, on June 24, 2005, SSI wrote another letter to Arbitrator Kral, this time to "follow up on the subject of 'non-monetary breaches.'" SSI reiterated its position that "Geo-Con left the job before it was finished" and noted that by virtue of the April 16,

2004, bankruptcy order, "EBC was allowed to assume Geo-Con's Subcontract with SSI." SSI then argued that the bankruptcy court directed EBC, as the purchaser of Geo-Con's asserts, "to make such cure payments as are required by Section 365 of the [Bankruptcy] Code and agreed to among the Debtors and respective contracting parties." SSI and Geo-Con had not agreed to EBC's assumption of the contract, SSI continued, nor had Geo-Con even informed SSI of its bankruptcy. "Nevertheless," the letter contended, "section 365 required Geo-Con/EBC to do the following in order to assume the contract" (referring to the list of three items in SSI's letter of March 16, 2005, to EBC). Until EBC satisfied those conditions, SSI concluded, "EBC cannot have assumed the contract, and lacks standing to pursue this arbitration case."

At the end of the letter, SSI noted its concern that should the Corps raise a future claim involving Geo-Con's work, EBC might try to evade its responsibility by "contending it is not Geo-Con. Part of SSI's relief sought in this arbitration is a declaration that EBC has in fact assumed all of Geo-Con's obligations under the Subcontract." Thus, in the same letter, SSI both argued that EBC had not properly assumed the subcontract (through its reference to alleged outstanding duties under Bankruptcy Code § 365 that prevented assumption) and argued that EBC had assumed the contract. Perhaps unsure of the latter point, SSI asked in its Answering Statement for a declaration that EBC had assumed the contract. It seems that what SSI was looking for was a ruling from the arbitrator that before EBC should be permitted to enforce Geo-Con's rights under the subcontract, it had to assure

that it also would fulfill Geo-Con's remaining contractual obligations. Once again, this was not a challenge to arbitrability; it was a position premised on a procedural question of standing and on the merits of the dispute.

Each party to the arbitration filed a position paper on July 18, 2005. In response to SSI's argument that it had never consented to the assignment of Geo-Con's rights to EBC, EBC argued that the subcontract did not require SSI's consent under these circumstances. Article 7.4.2 of the subcontract provides:

> [1] The Subcontractor shall not assign the Work of this Subcontract without the written consent of the Contractor, nor [2] subcontract the whole of this Subcontract without the written consent of the Contractor, nor [3] further subcontract portions of this Subcontract without written notification to the Contractor when such notification is requested by the Contractor.

Only the first clause restricts assignment; the second and third restrict further subcontracting. Moreover, the restriction on assignment only requires the subcontractor to obtain the contractor's written consent before assigning "the Work" of the subcontract. The work was completed by April 2003, a full year before the bankruptcy court issued its order approving EBC's assumption of Geo-Con's assets. The arbitrator took note of that timing in an express finding that "the Work" of the subcontract was complete before Geo-Con assigned the contract to EBC.

In its position paper, SSI reiterated its belief that Geo-Con had "repudiated" the parties' agreement, and that it "had continuing obligations to SSI to maintain insurance

coverage, provide a warranty for its work, and provide SSI with a performance bond to cover those obligations." SSI maintained its position that EBC must "comply with its outstanding obligations under the Contract," and that SSI therefore "seeks: (1) declaratory judgment confirming that EBC has assumed the contract; (2) a declaratory judgment that EBC is in breach on non-monetary terms of the Subcontract (e.g., insurance), and that EBC cure those defaults as previously ordered by the courts; (3) an accounting of the moneys to be paid between the parties on the Subcontract; and (4) an order requiring EBC to return to SSI the overpayments made to Geo-Con, believed to be in excess of $500,000" (footnotes omitted). SSI's argument further stated that according to the bill of sale attached to the bankruptcy order, "EBC did, in fact, assume the Subcontract." SSI added that "[w]hat Geo-Con could not do, and therefore what EBC cannot do, is to selectively accept the benefits of the Subcontract while rejecting the obligations." Until EBC fulfilled those obligations (as required by § 365), the argument concluded, "EBC lacks standing to invoke the Arbitration Clause in the Subcontract." The rest of the argument explained why and to what extent Geo-Con was overpaid for its work and concluded by stating that "EBC must cure all non-monetary defaults before getting anything from SSI. But applying the Subcontract, Geo-Con/EBC was vastly overpaid, and that money must be returned."

Discovery ensued, followed by a two-day arbitration hearing on August 23-24, 2005. The transcripts from the hearing reveal that the only issues addressed were who owed what and to whom. There was no discussion of

standing or of arbitrability. Even so, in a post-hearing brief filed by EBC on October 19, 2005 (SSI did not file a post-hearing brief), EBC addressed the "standing" defense presented in SSI's position paper:

> SSI claims that EBC lacks standing to compel SSI to arbitrate EBC's claim because SSI did not agree to the assignment of the Subcontract to EBC, and because certain alleged "cure" payments were not made. Generally speaking, issues of standing are for the arbitrator to decide in the first instance.

Arbitrator Kral's award was issued on November 21, 2005. He recognized that "a threshold issue was raised by SSI as to the standing of EBC to arbitrate this dispute under Subcontract Article 6.2 [the arbitration clause]. EBC agreed that it had assumed the Subcontract as evidenced by the Bankruptcy Court filings." He also noted that SSI's standing defense was premised on its position that EBC had not assumed the subcontract properly. EBC's response was that "GEO's performance of its work on the Project ended in December, 2002 and thereby the consent of SSI to the assumption is not required." The arbitrator resolved the standing question by stating that he "agree[d] with EBC's position." He went on to reject the entirety of SSI's counterclaim and awarded a total recovery, including contract interest, of $388,919.86 to EBC.

## II

On January 6, 2006, EBC filed an action to confirm its award in the Circuit Court of Cook County; SSI promptly

removed the case to federal court. As the district court described SSI's position, SSI argued "first, that the arbitrator exceeded his powers by entering an award in favor of EBC, who was not a party to the original Agreement. Further, SSI contends, even if EBC were a party to the Agreement, it lacks standing to invoke the arbitration clause because it was in default of the contract." We comment first on the standing argument, and then turn to the more troublesome arbitrability point.

We begin with a word about terminology. We are reminded of Justice Scalia's observation in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), that "[j]urisdiction . . . is a word of many, too many, meanings[.]" *Id.* at 90 (internal quotation marks omitted). The same, unfortunately, can be said for "standing." Everything from the fundamental requirement imposed by Article III that there must be a "case or controversy" between the parties seeking relief in federal court, to various prudential doctrines such as the restrictions on invoking the rights of third parties, to the inquiry whether a statute is designed to protect the rights of the person before the court, has been swept into the word "standing." There is no reason to suppose that arbitrators are bound to the case-or-controversy requirement that circumscribes the judicial power of the United States. Indeed, some state courts are authorized to give advisory opinions. See, *e.g.,* MASS. CONST. pt. II, ch. 3, art. 2; R.I. CONST. art. 10, § 3. See generally Jonathan D. Persky, *"Ghosts That Slay": A Contemporary Look at State Advisory Opinions*, 37 CONN. L. REV. 1155 (2005). In the context of arbitration, the term "standing" addresses the entitle-

ment of the party to raise a given point before the arbitrator. This is more like the concept of standing described by the Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519 (1983), in which the Court considered the question whether a union was a proper party to sue for treble damages under the antitrust laws when it was neither a consumer nor a competitor in the market in which trade was restrained. In the course of rejecting the union's right to sue, the Court commented that "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Id.* at 535 n.31.

That is the sense in which standing to arbitrate should be understood: is the petitioner a proper party to raise a particular claim in the arbitration? This explains why courts have not hesitated to hold that standing is a matter for the arbitrator to resolve, even though (as we note in a moment) arbitrability is usually an issue for the court. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557-58 (1964); *Chi. Typographical Union No. 16 v. Chi. Sun-Times, Inc.*, 860 F.2d 1420, 1424 (7th Cir. 1988) ("Procedural issues, including the standing of a party to the arbitration, . . . are for the arbitrator, so long as the subject matter of the dispute is within the arbitration clause.") (emphasis omitted); *United Steelworkers of Am., AFL-CIO-CLC v. Smoke-Craft, Inc.*, 652 F.2d 1356, 1360 (9th Cir. 1981) ("Whether the Steelworkers had standing as a party to the arbitration to proceed with that arbitration, which

had been properly commenced, was a procedural matter for the determination of the arbitrator."). SSI submitted the standing question to the arbitrator on its own initiative, and it was proper for the arbitrator to decide it. Focusing particularly on standing, the district court noted that "SSI's . . . objection to EBC's standing to enforce the arbitration clause relates to EBC's alleged breach of other contract provisions." Reiterating that this kind of issue is for the arbitrator, the court found that "[t]he arbitrator's conclusion . . . is thus subject to deferential review, which it easily survives."

The harder question is whether an agreement to arbitrate existed between the parties. It is difficult, however, not for the reasons the district court identified, but instead for a more fundamental reason. There is not a hint in the record that SSI ever called this issue to the arbitrator's attention or sought to enjoin the arbitration on the ground that there was no agreement to arbitrate. Thus, even though the ordinary rule is that the question whether an agreement to arbitrate exists is one for the court, see *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 277 (7th Cir. 1992), the right to a judicial determination of arbitrability is, like many rights, one that can be waived.

As our detailed explanation above of the arbitration proceedings in this case demonstrates, SSI never told the arbitrator that it thought this dispute was nonarbitrable. To the contrary, it voluntarily submitted to the arbitrator's authority, filed a counterclaim, and confined its objections to EBC's standing to arbitrate. Only after

the arbitrator issued an award unfavorable to SSI and the case wound up in court did SSI raise an objection to the arbitrator's authority to decide the dispute. SSI has stressed before this court that "[f]rom the outset, SSI contended that no agreement to arbitrate existed (and no contract of any kind existed) unless and until EBC complied with the requirements imposed by 11 U.S.C. § 365 for assignment and assumption of executory contracts." The problem is that SSI never said anything of the sort to the arbitrator. Not until it reached the district court did it recast its prior argument about standing as a challenge to arbitrability.

This is not a tactic we can accept, for sound policy reasons. It is terribly wasteful of the arbitrator's time, the parties' time, and the court's time. Anyone who wants to object to arbitrability is entitled to make her position known to the arbitrator and the other party; the other party may then, if it wishes, respond with a petition for an order to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and obtain a judicial determination on arbitrability. See, *e.g., Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1 (1983). In addition, keeping the arbitrability card close to the chest would allow a party like SSI to take a wait-and-see approach: if it had liked Arbitrator Kral's decision, it would have remained silent, but since it did not, it is now complaining about arbitrability.

This court has already disapproved this method of proceeding. In *AGCO Corp. v. Anglin*, 216 F.3d 589 (7th Cir. 2000), for example, we stated:

We first consider whether the Anglins waived any objection to the arbitrability of the Retail Obligations when they consented to arbitration and agreed to participate in the arbitration hearing. If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter. *See Jones Dairy Farm v. Local No. P-1236, United Food & Commercial Workers Int'l Union, AFL-CIO*, 760 F.2d 173, 175-76 (7th Cir. 1985). If, however, a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court. *Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 1777 v. Fansteel, Inc.*, 900 F.2d 1005, 1009 (7th Cir. 1990). The record suggests that the Anglins have followed the latter course.

216 F.3d at 593. It was "undisputed that counsel for the Anglins objected to arbitration" of the parties' dispute, *id.*, on the ground that "the Anglins could not have contemplated that their arbitration clause with AGCO would encompass a dispute with a nonsignatory party," *id.* at 596. We accordingly reversed the district court's confirmation of AGCO's award.

Unlike the Anglins, SSI failed at any time during the arbitration proceedings to raise or reserve an objection to arbitrability. Instead, it freely accepted the arbitrator's authority to decide the dispute and, indeed, submitted its own counterclaim for resolution. Only after the arbitration outcome displeased SSI did it restyle its "standing"

and "executory contract" arguments as encompassing a challenge to the existence of an agreement to arbitrate between SSI and the nonsignatory EBC. As we noted in *Jones Dairy Farm*:

> Jones Dairy Farm did not make [arbitrability] an issue. It did not, while agreeing to participate in the arbitration, challenge the arbitrator's jurisdiction, and make clear that it was preserving its challenge for eventual presentation to a court if the arbitrator ruled in the union's favor . . . . The company never questioned the arbitrator's authority.

760 F.2d at 175. "If a party voluntarily and unreservedly submits an issue to arbitration, he cannot later argue that the arbitrator had no authority to resolve it." *Id.* (citing cases from the Ninth, Fifth, and Second Circuits); see also *CUNA Mut. Ins. Soc'y v. Office and Prof'l Employees Int'l Union, Local 39*, 443 F.3d 556, 563 (2006) ("[T]here was not a true question of arbitrability in this case. Instead, CUNA dresses up its arguments about the scope of the arbitrator's authority in arbitrability clothing." (internal quotation marks omitted)); *cf. Flender*, 953 F.2d at 278 ("We reiterate 'this circuit's caution against allowing a party to use issues of the arbitrator's authority as a ruse to obtain judicial review of the merits of an arbitral award.'" (quoting *Burkart Randall v. Lodge No. 1076*, 648 F.2d 462, 467 (7th Cir. 1981))). SSI's professed challenge to arbitrability comes too late. By freely submitting to the arbitration of its claims without preserving a challenge to the arbitrator's authority, SSI missed the chance to come back later, before a court, and deny that an agreement to arbitrate existed.

## III

With SSI's challenge to arbitrability off the table, we have no trouble rejecting its remaining arguments. First, it is clear that Arbitrator Kral based his award on the contract and that he did not exceed his powers in any other respect when fashioning his award. The district court's opinion contains a thorough analysis of these points, see No. 06 C 212, 2006 WL 2853830 (N.D. Ill. Sept. 29, 2006). We see no need to repeat everything it said here, particularly given the level of deference that we apply to an arbitrator's award. See *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc.*, 266 F.3d 645, 650-51 (7th Cir. 2001) ("[N]either error nor clear error nor even gross error is a ground for vacating an award[;] if the district judge is satisfied that the arbitrators resolved the entire dispute and can figure out what that resolution is, he must confirm the award."); *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir. 1994) ("Judicial review of arbitration awards is tightly limited; perhaps it ought not be called 'review' at all.").

Nor did the district court abuse its discretion in denying SSI's motion for reconsideration under FED. R. CIV. P. 59. See *Zivitz v. Greenberg*, 279 F.3d 536, 539 (7th Cir. 2002). The motion argued that EBC had concealed an affidavit that contradicted the testimony of EBC's sole witness at the arbitration hearing, and that this "newly discovered evidence" tended to show that EBC's award had been "procured by fraud, corruption or other means," which is one ground for vacating or amending an award under the FAA. See 9 U.S.C. § 10(a)(1).

To succeed on a motion under Rule 59, a party must show that: (1) it has evidence that was discovered post-trial; (2) it had exercised due diligence to discover the new evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a new result. See *Matter of Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 78 F.3d 285, 293-94 (7th Cir. 1996). SSI argues that in this case, however, the court should not have relied on the normal criteria for a Rule 59 motion, because the FAA "provides the exclusive grounds for challenging an arbitration award within its purview," *LaFarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1338 (9th Cir. 1986). Section 10(a)(1) of the FAA calls for the court to consider whether EBC's alleged fraud was (1) not discoverable upon the exercise of due diligence prior to the arbitration; (2) materially related to an issue in the arbitration; and (3) established by clear and convincing evidence. *Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 333 (7th Cir. 1995).

We need not decide which was the proper standard to apply in this case, because we do not think the district court abused its discretion under either of them. Under both Rule 59 and 9 U.S.C. § 10(a)(1), the materiality of the evidence is critical. At the hearing on SSI's Rule 59 motion, the district court concluded that "nothing in the so-called newly discovered document . . . bears any relationship to the award, and it's simply not material or outcome determinative." SSI argues that under the FAA standard, the evidence must be material not necessarily to *the outcome* of the arbitration, but simply to *some issue* in the arbitra-

tion. SSI cites only *Gingiss International, supra*, in support of this distinction, but *Gingiss* drew no such line. The question there was whether a district court erred by refusing to set aside an arbitration award under 9 U.S.C. § 10(a)(1); it had nothing to do with the standard of review that applies to a post-trial motion in a case to confirm an arbitral award. Moreover, *Gingiss* does not stand for the odd proposition that something might be material to an issue in an arbitration, but immaterial to the outcome. Without stronger support for this notion, we decline to adopt it. Finally, as EBC points out, § 10(a)(1) provides for *vacatur* only if the award itself was procured by "corruption, fraud, or undue means." In other words, even if SSI is correct and we should be relying exclusively on the FAA, we must find a nexus between the purported fraud and the arbitrator's final decision. The district court found no such nexus, nor do we.

We mention briefly several other reasons why SSI cannot meet even the FAA standard. It is debatable at best whether the affidavit in question was concealed fraudulently; indeed, EBC denied that it withheld the document intentionally, and SSI offers no evidence to the contrary. The FAA also requires that the complaining party act with due diligence, yet the district court expressed doubt that SSI had done so, since it had been aware of the issue for at least a month before the district court's initial decision. Finally, even assuming that SSI had acted with due diligence and that the evidence of fraudulent withholding was clear and convincing, the fact remains that the district court found the "so-called newly discovered evidence" to be both cumula-

tive and immaterial. Both the district judge and the arbitrator were already aware of everything contained in the supposedly concealed document when they made their respective decisions. Under either Rule 59 or §10(a)(1), this finding supports a denial of SSI's motion.

## IV

The district court's judgment confirming the arbitrator's award is AFFIRMED.