# United States Court of Appeals
## For the First Circuit

No. 21-1831

RODRIGO RIBADENEIRA; SUPERDEPORTE PLUS PERU S.A.C.,

Petitioners, Appellees,

v.

NEW BALANCE ATHLETICS, INC.,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Kayatta, Lipez, and Howard,
Circuit Judges.

Kevin P. Martin, with whom Mark E. Tully, Kate E. MacLeman, Gerard J. Cedrone, and Goodwin Procter LLP were on brief, for appellant.

David M. Cooper, with whom David M. Orta, Julianne F. Jaquith, Gregg Badichek, and Quinn Emanuel Urquhart & Sullivan, LLP were on brief, for appellees.

April 6, 2023

**LIPEZ**, **Circuit Judge**.    At the beginning of 2013, appellant New Balance Athletics, Inc. ("New Balance") entered into a contract (the "Distribution Agreement") with Peruvian Sporting Goods S.A.C. ("PSG") to distribute its products in Peru.    This Distribution Agreement contained an arbitration clause, which New Balance invoked in 2018 to initiate arbitration proceedings against PSG.    Also joined as respondents in this arbitration were appellees Rodrigo Ribadeneira, the controlling owner of PSG, and Superdeporte Plus Peru S.A.C. ("Superdeporte"), another business entity owned by Ribadeneira in Peru.    The arbitrator issued two awards, which imposed liability on PSG and Superdeporte for breach of the Distribution Agreement, and on PSG, Superdeporte, and Ribadeneira for tortious interference.    The arbitrator also rejected three counterclaims brought against New Balance.

Ribadeneira and Superdeporte subsequently filed a motion in the district court to vacate the arbitration awards.  The awards had to be vacated, they contended, because they were nonsignatories of the Distribution Agreement, and hence not subject to its arbitration clause.[1]  Agreeing that the arbitrator had improperly exercised jurisdiction over Ribadeneira and Superdeporte, the

---

[1] PSG did not join Ribadeneira and Superdeporte in filing the motion to vacate, and indeed, appellees expressly recognize that PSG was bound, as a signatory to the Distribution Agreement, to abide by that agreement's arbitration clause.  Consequently, PSG is not a party to this appeal.

district court vacated the awards.  Because we conclude that theories of assumption and equitable estoppel apply here to support arbitral jurisdiction over appellees, we reverse the judgment of the district court.

**I.**

The resolution of this appeal turns in part on the parties' actions before and during the arbitration proceedings. Hence, we recount the tangled history of the parties' business relationship, the litigation in Peru arising out of the breakdown of that relationship, and the arbitration proceedings that resulted in the contested awards.[2]

**A.   The Original Distribution Agreement and Negotiations over a New Agreement**

On January 1, 2013, New Balance and PSG entered into the Distribution Agreement, pursuant to which PSG would serve as the exclusive wholesale distributor of New Balance products in Peru in exchange for paying distribution fees to New Balance.  At the time, Ribadeneira was PSG's majority shareholder but was not himself a party to the agreement.  The agreement was set to expire after an initial term of three years but would automatically renew for an

---

[2] As an aid to understanding the procedural history of the Peruvian litigation, the arbitration proceedings, and the challenge to the arbitration awards in the district court, we include an Appendix to this opinion in the form of a chart that summarizes the claims and counterclaims brought by the various parties in the various forums, as well as the key rulings of the arbitrator and the district court.

additional year absent timely notice by either party objecting to renewal.

Section 21 of the Distribution Agreement contained an arbitration clause, providing that:

> The parties agree that any and all disputes (whether in contract or any other theories of recovery) related to or arising out of this Agreement or the relationship, its application and/or termination (including post-termination obligations) shall be settled by final and binding arbitration in accordance with the UNCITRAL Arbitration Rules.

The Distribution Agreement also included two choice-of-law provisions. First, there is a provision in Section 20 setting out the law governing the agreement:

> This Agreement . . . shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, U.S.A. without giving effect to principles of conflicts of laws . . . .

Second, there is a provision in Section 21, which dealt with arbitration, requiring that:

> The arbitrator shall determine the matters in dispute in accordance with the laws of the Commonwealth of Massachusetts, USA.

While the Distribution Agreement was still in effect, New Balance and PSG began negotiating a new distribution agreement. By that time, PSG was in arrears with respect to distribution fees it owed New Balance.[3] In September 2015, the parties exchanged a

_____

[3] Although the parties disagreed below about the extent of

- 4 -

draft of an "Amended and Restated Distribution Agreement" (the "New Agreement"). While some of the terms in the putative New Agreement differed from those in the original Distribution Agreement, its arbitration clause remained identical. In their negotiations, both parties understood that while the New Agreement initially would be executed between New Balance and PSG, a new entity -- Superdeporte -- would be incorporated and would, once operational, replace PSG as the distributor of New Balance products in Peru.

Meanwhile, as neither PSG nor New Balance gave notice of an intention to let the original Distribution Agreement expire on December 31, 2015, the agreement renewed by its terms until December 31, 2016.

In May 2016, Superdeporte was ready to begin operations. Believing that it had reached agreement with New Balance on the New Agreement -- and that, accordingly, the New Agreement was binding on both parties -- PSG informed New Balance that Superdeporte was ready to distribute New Balance products in Peru and sought New Balance's agreement to modify the New Agreement to substitute Superdeporte for PSG as its Peruvian distributor.

---

this arrearage, that dispute is not material to this appeal, which does not turn on the merits of the underlying claims and counterclaims in the arbitration.

In response, New Balance denied that it had ever concluded the New Agreement with either PSG or Superdeporte. Shortly thereafter, New Balance gave notice that it would not continue the distribution relationship with either PSG or Superdeporte beyond the Distribution Agreement's expiration on December 31, 2016. Instead, it would be using a different Peruvian distributor, Deportes Sparta.

## B. The Assignments to Ribadeneira

In November 2016, shortly before the extended expiration of the Distribution Agreement, PSG and Superdeporte each executed assignment agreements with Ribadeneira that transferred to him any legal claims they had against New Balance arising from the New Agreement and the negotiations surrounding it. The assignment agreements contained language stating that PSG and the principals of Superdeporte had engaged in negotiations with New Balance regarding a new distribution agreement, but that, "once the contractual terms were agreed and the contract ready to be executed," New Balance announced that it would work with another distributor in Peru, leading to "a dispute" between New Balance, on the one side, and PSG and Superdeporte, on the other. The assignment agreement with each company then provided for the transfer to Ribadeneira of "all [their] rights in attention to the dispute . . . against [New Balance], before judicial and administrative authorities," thus allowing Ribadeneira to bring

- 6 -

legal actions against New Balance to vindicate these rights "in Peru and anywhere else in the world."

## C. Litigation in Peru

In January 2017, as PSG and Superdeporte's assignee under the assignment agreements, Ribadeneira sued New Balance in a Peruvian court, asserting two claims of civil liability (the "Peru Claims"): (1) that the New Agreement was an enforceable contract, which New Balance had breached; and (2) that, in the alternative, even if the New Agreement was never validly executed, New Balance had violated its precontractual duty to negotiate with PSG and Superdeporte in good faith.

The following month, Ribadeneira moved ex parte for an injunction restraining New Balance from using any distributor in Peru other than Superdeporte. The Peruvian court granted this relief ("the Peru injunction") in December 2017, thereby compelling New Balance to suspend its distribution relationship with Deportes Sparta. The Peru injunction was lifted by the court in July 2018 after New Balance had an opportunity to contest it.[4]

## D. The Arbitration Proceedings

Later in July 2018, New Balance initiated arbitration proceedings against PSG and Ribadeneira in Boston, Massachusetts,

---

[4] The Peruvian court dissolved the injunction apparently based on its determination that New Balance and PSG no longer had any distribution agreement in effect.

seeking compensation for allegedly unpaid fees under the Distribution Agreement. In support of the tribunal's jurisdiction over Ribadeneira, New Balance argued that, as PSG's assignee, Ribadeneira had taken its place under the Distribution Agreement.

Responding to New Balance's notice of arbitration in September 2018, Ribadeneira objected to the arbitrator's jurisdiction over him because he was a nonsignatory of the Distribution Agreement. He also argued that since PSG had only assigned him its claims in relation to the New Agreement, his status as assignee could not bind him to arbitrate New Balance's claim that PSG had breached the original Distribution Agreement. In an amended response filed the following month, PSG asserted a counterclaim alleging that New Balance itself had breached the Distribution Agreement by refusing to accept orders from PSG by letters of credit.

In January 2019, New Balance moved to compel PSG and Ribadeneira to arbitrate the Peru Claims, arguing both that the arbitration clause in the Distribution Agreement encompassed the Peru Claims, and that the arbitrator had jurisdiction over Ribadeneira. PSG and Ribadeneira opposed the motion, contesting the arbitrability of the Peru Claims and arbitral jurisdiction over Ribadeneira.

The arbitrator granted New Balance's motion to compel arbitration in March 2019, ruling that both of the Peru Claims

- 8 -

were subject to arbitration, and that Ribadeneira could be compelled to arbitrate them.

Two months later, on May 2, 2019, Ribadeneira executed new assignment agreements with PSG and Superdeporte that assigned back to them the rights they had previously transferred to him.

The following day, New Balance filed an amended notice of arbitration, adding Superdeporte as a respondent in New Balance's claim for breach of the Distribution Agreement. New Balance also added a claim against PSG, Ribadeneira, and Superdeporte (collectively, the "arbitration respondents") alleging that, by obtaining the Peru injunction based on misrepresentations, they had tortiously interfered with its distribution agreement with Deportes Sparta.

In a response filed on May 17, 2019, Ribadeneira and Superdeporte objected to arbitral jurisdiction over them as to New Balance's breach of contract claim because neither of them were signatories of the Distribution Agreement. The arbitration respondents also denied that New Balance's tortious interference claim was arbitrable.

On May 31, 2019, the arbitration respondents moved for summary disposition. Ribadeneira asserted that the tribunal lacked jurisdiction over him entirely. He argued that he was not bound to arbitrate New Balance's breach of contract claim because he was neither a party to the Distribution Agreement nor to the

New Agreement. He also reiterated that he was not obligated to arbitrate the Peru Claims, because he had transferred the rights underlying the Peru Claims back to PSG and Superdeporte. The arbitration respondents also challenged the arbitrability of New Balance's tortious interference claim, insisting that any claim for damages arising from the Peru injunction could only be adjudicated by the Peruvian court itself.

In August 2019, the arbitrator denied the arbitration respondents' motion for summary disposition. With respect to the tortious interference claim, the arbitrator ruled that the Distribution Agreement's arbitration clause was broad enough to embrace that claim, because the Peruvian litigation underlying that claim implicated the "relationship" between the parties -- or more specifically the breakdown of that relationship. Moreover, because it was Ribadeneira who had requested the Peru injunction, arbitral jurisdiction over the tortious interference claim entailed jurisdiction over him with respect to that claim, notwithstanding the new assignment agreements by which he assigned back to PSG and Superdeporte the rights they had previously assigned to him. As for the tribunal's jurisdiction over Ribadeneira with respect to New Balance's breach of contract claim, the arbitrator recognized that because PSG -- but not Ribadeneira -- was a party to the original Distribution Agreement, ordinarily Ribadeneira would not be subject to that contract's arbitration

clause.  However, the arbitrator deferred ruling on whether summary disposition was warranted on that issue until the close of discovery, given that evidence could yet emerge to support piercing the corporate veil to attribute PSG's potential liability to Ribadeneira, which would support Ribadeneira's joinder as a respondent.

After discovery closed on November 15, 2019, the arbitration respondents filed a renewed motion for summary disposition to address this deferred issue.  They contended that, because no evidence had emerged to support a veil-piercing theory of Ribadeneira's liability for PSG's alleged breach of the Distribution Agreement, he was not obliged to arbitrate that claim. They further argued that because Superdeporte was not a party to the Distribution Agreement, it was not required to arbitrate New Balance's claim for breach of that agreement.

In December 2019, the arbitration respondents filed another amendment to their response to assert two additional counterclaims.  These counterclaims, brought by PSG and Superdeporte against New Balance, alleged what were, in essence, the Peru Claims.  Specifically, the first counterclaim alleged that New Balance had breached the New Agreement -- which they insisted was a legally binding contract between New Balance, PSG, and Superdeporte -- by discontinuing its distribution relationship with PSG and Superdeporte after 2016.  The second counterclaim

contended, in the alternative, that New Balance had breached its precontractual obligation under Massachusetts law to negotiate the New Agreement in good faith. PSG also reiterated its counterclaim against New Balance alleging breach of the Distribution Agreement.

The arbitration respondents' second amended response also renewed Ribadeneira's objection to the arbitrator's jurisdiction over him, pointing to the absence of evidence to support piercing PSG's corporate veil and the new assignment agreements by which he had assigned back to PSG and Superdeporte the right to pursue the Peru Claims.

Arbitration hearings were held in March and May 2020. The arbitration respondents submitted a post-hearing brief in which they maintained their objection to the arbitrator's jurisdiction over Ribadeneira and Superdeporte as to New Balance's claim for breach of the original Distribution Agreement.

## E. The Arbitrator's Partial Final Award & Final Award

On August 20, 2020, the arbitrator issued a Partial Final Award, finding for New Balance on its claim that PSG had breached the Distribution Agreement, and -- on the theory that Superdeporte was PSG's successor-in-interest -- holding PSG and Superdeporte jointly liable for the $826,102.60 in damages awarded.[5]

---

[5] Because the arbitrator declined to pierce the corporate veil to hold Ribadeneira liable for PSG's conduct, he did not impose liability on Ribadeneira for breach of the Distribution Agreement.

- 12 -

The arbitrator also agreed with New Balance that Ribadeneira had tortiously interfered with its agreement with Deportes Sparta by seeking and obtaining the Peru injunction. Determining that the assignment of rights from PSG and Superdeporte to Ribadeneira "created principal-agent relationships rendering the principals as well as the agent responsible," he imposed liability for tortious interference not only on Ribadeneira but also on PSG and Superdeporte, holding all three jointly liable for $215,736.71 in damages. The arbitrator also rejected PSG's counterclaim alleging breach by New Balance of the Distribution Agreement, as well as the two counterclaims brought against New Balance by PSG and Superdeporte. In rejecting PSG and Superdeporte's counterclaim alleging that New Balance had breached the New Agreement, the arbitrator determined that the New Agreement never became an enforceable contract.[6]

Pending further proceedings, the arbitrator reserved a further decision on the calculation of interest on the contractual damages and the award of reasonable attorney's fees and expenses, inviting the parties to submit briefing on these issues.

---

[6] The arbitrator rejected PSG's counterclaim because he concluded that New Balance did not breach the Distribution Agreement. He rejected PSG and Superdeporte's counterclaim alleging that New Balance had violated its obligation of good faith in the contract negotiation process because he found no evidence that New Balance had negotiated in bad faith.

Following the issuance of the Partial Final Award, the arbitration respondents filed a request under the UNCITRAL Arbitration Rules for an explanation of the legal basis for arbitral jurisdiction over Ribadeneira and Superdeporte, insisting that the arbitrator lacked jurisdiction over these two respondents to arbitrate "any claims."

In a memorandum and order issued on November 4, 2020, the arbitrator declined to modify or expand his discussion or conclusions in the Partial Final Award.  He reiterated that Superdeporte was subject to his jurisdiction as to New Balance's breach of contract claim because Superdeporte was PSG's "business successor."  He also explained, restating the reasoning in the Partial Final Award, that he had exercised jurisdiction over all three arbitration respondents as to the tortious interference claim because Ribadeneira had sought and obtained the underlying injunction in Peru pursuant to assignments of rights from PSG and Superdeporte.

The Final Award issued on February 11, 2021, awarding contractual interest on New Balance's breach of contract claim, and allowing New Balance to recover attorney's fees and expenses. The arbitrator also increased the principal amount of damages on the contract claim.  A provision in the Final Award stated that the award was made "in full settlement of all claims and counterclaims submitted to this Arbitration."

**F. Litigation in U.S. District Court**

On February 1, 2021, shortly before the issuance of the Final Award, appellees Ribadeneira and Superdeporte filed a motion in the U.S. District Court for the District of Massachusetts, asking the court to vacate the Partial Final Award under Section 10(a)(4) of the Federal Arbitration Act ("FAA") because the arbitral tribunal lacked jurisdiction over them. On February 22, 2021, following the issuance of the Final Award, appellees filed an amended motion seeking to vacate both the Partial Final Award and the Final Award. Appellees again contended that vacatur was appropriate because the arbitrator had exceeded his authority in exercising jurisdiction over them.

Opposing appellees' amended motion, New Balance filed a motion to dismiss and a cross-motion to confirm the arbitration awards. New Balance set forth three arguments in support of its motions: (1) appellees' amended motion was time-barred regardless of whether the Massachusetts Uniform Arbitration Act ("MUAA") or the FAA applied; (2) Superdeporte had waived any argument that the arbitrator lacked jurisdiction over it by raising its jurisdictional objection too late; and (3) while appellees were not parties to the Distribution Agreement, they were nevertheless subject to the arbitrator's jurisdiction under theories of assumption and equitable estoppel.

The district court denied New Balance's motion to dismiss, agreeing with the appellees that their amended motion was not time-barred. The court first determined that the FAA's three-month deadline for filing a motion to vacate applied, see 9 U.S.C. § 12, despite the choice-of-law provision in the Distribution Agreement stipulating that "[t]he arbitrator shall determine the matters in dispute" according to Massachusetts law. Reasoning that this choice-of-law provision only specified the law to be applied in arbitration proceedings, rather than in court challenges to the enforcement of arbitration awards, the district court concluded that there was no explicit agreement to displace the FAA in favor of state law. Accordingly, the FAA's three-month deadline governed. The court went on to conclude that this three-month period only began to run when the arbitrator issued the Final Award, not the Partial Final Award, because the arbitrator did not intend for the Partial Final Award to resolve all claims before him. Hence, given that appellees filed their amended motion to vacate within ninety days of the issuance of the Final Award, the district court found that it had been timely filed.

The district court also granted the appellees' amended motion to vacate the arbitration awards. On the waiver issue, the court determined that Superdeporte's jurisdictional objection was preserved because Superdeporte had objected to jurisdiction prior to the arbitration hearing. On the merits of appellees'

jurisdictional challenge, the court concluded that the arbitrator lacked jurisdiction over both Ribadeneira and Superdeporte as nonsignatories of the Distribution Agreement, and that neither principles of assumption nor of equitable estoppel overcame their nonsignatory status. Accordingly, the court ruled that appellees were not obligated to arbitrate.

New Balance timely appealed.

## II.

Before evaluating the merits of the district court's decision to vacate the challenged arbitration awards for lack of arbitral jurisdiction over appellees, we first address these threshold issues: whether appellees' amended motion to vacate was timely filed, and, if so, whether Superdeporte waived its jurisdictional challenge to the arbitration awards.

### A. Timeliness of Appellees' Motion to Vacate

New Balance argues that the two choice-of-law provisions in the Distribution Agreement together demonstrate that the parties intended for Massachusetts law -- rather than the FAA -- to govern all aspects of the arbitration process, including the deadline for seeking judicial review of any arbitration award. Under the MUAA, a party seeking to vacate an arbitration award must file an application to vacate the award "within thirty days after delivery of a copy of the award." Mass. Gen. Laws ch. 251, § 12(b). This period begins to run upon "the delivery of the

arbitration award," not the issuance of the "final decision." Maltz v. Smith Barney, Inc., 694 N.E.2d 840, 842 n.8 (Mass. 1998). Since appellees' initial motion to vacate and amended motion were filed on February 1, 2021, and February 22, 2021, respectively -- significantly more than thirty days after the Partial Final Award was issued on August 20, 2020 -- New Balance contends that appellees' amended motion is time-barred to the extent that it seeks to vacate the liability and damages determinations made in the Partial Final Award.

While parties to an arbitration contract "may contemplate enforcement under state statutory or common law" rather than the FAA, Hall St. Assocs. v. Mattel, Inc., 552 U.S. 576, 590 (2008), we have emphasized that "FAA displacement . . . can occur 'only if the parties have so agreed explicitly.'" Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 932 F.3d 1, 7 (1st Cir. 2019) (quoting Ortiz-Espinosa v. BBVA Secs. of P.R., Inc., 852 F.3d 36, 42 (1st Cir. 2017), abrogated on other grounds by Badgerow v. Walters, 142 S. Ct. 1310 (2022)). As such, the "mere inclusion of a generic choice-of-law clause within the arbitration agreement is not sufficient . . . to support a finding that contracting parties intended to opt out of the FAA's default regime for vacatur of arbitral awards." Id. at 8 (quoting P.R. Tel. Co. v. U.S. Phone Mfg. Corp., 427 F.3d 21, 29 (1st Cir. 2005), abrogated on other grounds by Hall St. Assocs., 552 U.S. 576).

- 18 -

To support its argument that the MUAA rather than the FAA applies, New Balance relies on the choice-of-law provisions in Sections 20 and 21 of the Distribution Agreement. Neither of these provisions, however, indicates sufficiently explicit agreement to displace the FAA's enforcement regime in favor of the MUAA.

Section 20, which provides that the Distribution Agreement "shall be governed by and construed in accordance with" Massachusetts law, is the kind of generic choice-of-law provision we have previously held insufficient for FAA displacement. It closely matches, for example, a choice-of-law provision instructing that a contract was to "be construed in accordance with the internal substantive laws of the Commonwealth of Puerto Rico" that we determined to be insufficient to effectuate FAA displacement. See Dialysis Access Ctr., 932 F.3d at 7-8.

The provision in Section 21 requiring the arbitrator to "determine the matters in dispute" according to Massachusetts law likewise does not demonstrate the parties' specific intention to displace the FAA enforcement regime. As the district court correctly observed, this provision "refers only to the law the arbitrator will apply when deciding matters in dispute." Ribadeneira v. New Balance Athletics, Inc., No. 21-cv-10173-ADB, 2021 WL 4419943, at *5 (D. Mass. Sept. 27, 2021). It does not

- 19 -

contemplate the application of Massachusetts law to actions in a judicial forum to enforce or vacate arbitration awards.[7]

We therefore conclude that the district court correctly applied the FAA's deadline, which requires notice of a motion to vacate an arbitration award to be filed "within three months after the award is filed or delivered."  9 U.S.C. § 12.

New Balance contends that, even accounting for the FAA's three-month deadline, appellees' amended motion was still untimely because it was filed more than three months after the arbitrator issued the Partial Final Award.  To address this claim, we begin with the principle that, in actions seeking to set aside an arbitration award under Section 10(a)(4) of the FAA, "[i]t is essential for the district court's jurisdiction that the arbitrator's award was final, not interlocutory."  Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 233 (1st Cir. 2001) (alteration in original) (quoting El Mundo Broad. Corp. v. United Steelworkers of Am., AFL-CIO CLC, 116 F.3d 7, 9 (1st Cir. 1997)).

---

[7] Where courts have found FAA displacement, the choice-of-law provisions at issue have been much more explicit in requiring the application of state law in the enforcement of arbitration awards or in proceedings beyond the arbitration itself.  See, e.g., Foulger-Pratt Residential Contracting, LLC v. Madrigal Condos., LLC, 779 F. Supp. 2d 100, 110 (D.D.C. 2011) (clause making an arbitration agreement "specifically enforceable pursuant to . . . the laws of the District of Columbia"); Ga. Cas. & Sur. Co. v. Excalibur Reinsurance Corp., 4 F. Supp. 3d 1362, 1364, 1369 (N.D. Ga. 2014) (clause providing that "all proceedings pursuant [to the arbitration provision] shall be governed by the law of the state").

The "familiar finality standard" is that "[n]ormally, an arbitral award is deemed 'final' provided it evidences the arbitrators' intention to resolve all claims submitted in the demand for arbitration." Univ. of Notre Dame (USA) in Eng. v. TJAC Waterloo, LLC, 861 F.3d 287, 291 (1st Cir. 2017) (quoting Hart Surgical, 244 F.3d at 233).

As an exception to this general rule, a partial award may qualify as final "when the arbitrating parties have . . . agreed to litigate [the issues] in separate, independent stages." Id. This agreement to bifurcate proceedings may be "informal." Id. (citing Providence J. Co. v. Providence Newspaper Guild, 271 F.3d 16, 19-20 (1st Cir. 2001)). Whether an agreement -- including an agreement that was "never formally stated" -- to bifurcate proceedings may be found depends on whether the parties "had expressed an intent to bifurcate." Providence J., 271 F.3d at 19-20.

Here, as the district court also concluded, there is no evidence that the parties to the arbitration manifested any intention to divide the proceedings into two parts. See Ribadeneira, 2021 WL 4419943, at *6. The exception covering bifurcated arbitration proceedings therefore does not apply. Accordingly, the Partial Final Award qualifies as "final" for purposes of starting the FAA's three-month clock only if it reveals the arbitrator's intention to settle all claims before him.

- 21 -

We discern no such intention.  In issuing the Partial Final Award, the arbitrator indicated that he was "retain[ing] jurisdiction" and "re-open[ed] the hearings for written submissions" on issues including the calculation of contractual interest and the award of attorney's fees and expenses.  The issue of contractual interest, as the arbitrator later explained in the Final Award, was "a subject of New Balance's contractual claim." While the arbitrator described the awards made in the Partial Final Award as "preliminary," he stated that the Final Award was "in full settlement of all claims and counterclaims submitted to this Arbitration."

We therefore conclude that only the Final Award was a "final" arbitration award that the district court had jurisdiction to review.  Accordingly, the FAA's three-month deadline is measured from the date that the Final Award issued, namely February 11, 2021.  Since appellee's amended motion to vacate was filed on February 22, 2021, it was timely.

## B.  Waiver of Superdeporte's Jurisdictional Challenge

New Balance contends that Superdeporte waived its right to challenge the arbitrator's jurisdiction, offering two arguments.  First, New Balance maintains that Superdeporte only raised a sufficient objection to arbitral jurisdiction after the arbitrator had made a decision on the merits.  This objection was thus waived because it came too late.  Second, New Balance urges

that even if Superdeporte's earlier jurisdictional objections, made in May 2019, were sufficient, it abandoned these objections when it (along with PSG) asserted counterclaims before the arbitrator in December 2019 without contemporaneously renewing its jurisdictional challenge.  We examine these arguments in turn.

### 1. Timing of Initial Objection

Because "[f]ederal courts encourage participation in arbitration,"[8] Kaplan v. First Options of Chi., Inc., 19 F.3d 1503, 1510 (3d Cir. 1994), aff'd, 514 U.S. 938 (1995), "[a] party does not have to try to enjoin or stay an arbitration proceeding in order to preserve its objection to jurisdiction."  China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp., 334 F.3d 274, 290 (3d Cir. 2003) (quoting Kaplan, 19 F.3d at 1510).  Provided "a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court."  Env't Barrier Co. v. Slurry Sys., Inc., 540 F.3d 598, 606 (7th Cir. 2008) (quoting AGCO Corp. v. Anglin, 216 F.3d 589, 593

---

[8] This encouragement flows from the "liberal federal policy favoring arbitration agreements" established by the FAA itself. See Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1621 (2018) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  In light of this policy, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including when the doubt concerns "an allegation of waiver."  Moses H. Cone, 460 U.S. at 24-25.

- 23 -

(7th Cir. 2000)). Nevertheless, such an objection to the arbitrator's jurisdiction "must be made on a timely basis, or it is waived." ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc., 102 F.3d 677, 685 (2d Cir. 1996); see also Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 368 (2d Cir. 2003).

There is broad agreement among the federal courts of appeal that a jurisdictional objection comes too late if it is only raised after the arbitrator has ruled on the merits. See, e.g., OJSC Ukrnafta v. Carpatsky Petrol. Corp., 957 F.3d 487, 498 (5th Cir. 2020); Env't Barrier, 540 F.3d at 607; Pa. Power Co. v. Loc. Union No. 272 of the Int'l Bhd. of Elec. Workers, 886 F.2d 46, 50 (3d Cir. 1989); Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir. 1983). As the Fifth Circuit explained, "[t]his waiver rule prevents inefficiency and . . . gamesmanship." Ukrnafta, 957 F.3d at 498. Allowing a party to challenge arbitral jurisdiction in the courts after the arbitrator's merits decision would encourage gamesmanship because "a party could wait to see how the arbitration tribunal ruled before deciding whether to challenge its jurisdiction." Id.; see also, e.g., Env't Barrier, 540 F.3d at 606 (noting that such a "wait-and-see approach" is "not a tactic [the court] can accept, for sound policy reasons"); Daniel, 724 F.2d at 1357 (similar); Ficek v. S. Pac. Co., 338 F.2d 655, 657 (9th Cir. 1964) (similar). It would also be inefficient to allow such a late jurisdictional

objection because vacating an arbitrator's decision for lack of jurisdiction after the pursuit of discovery, the submission of briefs, and the holding of hearings would be "terribly wasteful of the arbitrator's time, the parties' time, and the court's time." Env't Barrier, 540 F.3d at 606. It would likewise be unfair to the other parties to the arbitration who had shouldered the effort and expense of the arbitration proceedings until their conclusion, only to find that they still face the risk of having to relitigate the same issues in a judicial forum.

These considerations of gamesmanship, inefficiency, and fairness do not apply exclusively to circumstances where a party fails to object to arbitrability until after the arbitrator has decided the merits. Thus, where a party objected to arbitrability "shortly before the arbitrator announced her decision," after that party had voluntarily participated in arbitration proceedings "over a period of several months," the Ninth Circuit deemed the objection waived. Daniel, 724 F.2d at 1357; accord Upshur Coals Corp. v. United Mine Workers of Am., Dist. 31, 933 F.2d 225, 228 (4th Cir. 1991) (disapproving rule allowing a "party that suspects it will lose in arbitration to withdraw consent to arbitrate shortly before a decision is handed down"). By contrast, courts have declined to find waiver where the objecting party did not participate "extensively" in the arbitration proceedings on the merits of the dispute before challenging the arbitrator's

- 25 -

jurisdiction.[9]  Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1279 (9th Cir. 2006) (discussing Textile Unlimited, Inc. v. A..BMH & Co., 240 F.3d 781, 788 (9th Cir. 2001)); see also Opals on Ice, 320 F.3d at 366, 368 (declining to find waiver where the party challenging waiver first raised its objection one month after the commencement of arbitration proceedings but thereafter raised its challenge "continuously").

We decline to articulate any bright-line rule as to when a party's participation in arbitration proceedings becomes so extensive as to preclude a challenge to arbitral jurisdiction, engaging instead in a fact-specific inquiry.  We observe that after New Balance added Superdeporte as a respondent in its amended notice of arbitration, all three arbitration respondents filed a response a mere two weeks later, May 17, 2019, in which they asserted that the arbitral tribunal "does not have jurisdiction over . . . Superdeporte" as to New Balance's claim for breach of the Distribution Agreement because Superdeporte was "never part of the Distribution Agreement."  The arbitration respondents also

---

[9] Similarly, another court found waiver where the objection to arbitrability was raised "more than 43 months . . . since the parties first exchanged default notices, more than 41 months . . . since service of the arbitration demand, and more than 15 months . . . since the first witness was sworn in the arbitration," and after the arbitrators "had conducted an extensive examination of the relevant evidence, including 45 days of hearings . . ., 409 documentary exhibits, the testimony of 14 witnesses, and a tour of the development site."  ConnTech Dev., 102 F.3d at 685.

denied that New Balance's tortious interference claim was arbitrable. In a motion for summary disposition filed on May 31, 2019, the arbitration respondents reiterated their objection to arbitral jurisdiction over all three of them -- including Superdeporte -- as to the tortious interference claim.

Hence, contrary to New Balance's claim, Superdeporte sufficiently challenged its obligation to arbitrate New Balance's breach of contract claim and the tortious interference claim well before the arbitrator made any decision on the merits. Indeed, Superdeporte objected to the arbitrator's jurisdiction soon after it was added as a respondent, before the close of discovery and before any hearings on the merits.[10] On these facts, we conclude that Superdeporte did not waive its jurisdictional challenge by raising its initial objection unreasonably late.

## 2. Effect of the Counterclaims

Having determined that Superdeporte raised a sufficient jurisdictional objection in May 2019 to avoid any waiver argument

---

[10] The district court stated that Superdeporte first objected to arbitrating claims arising from the Distribution Agreement, in particular New Balance's breach of contract claim, "after the close of discovery but before the hearing." Ribadeneira, 2021 WL 4419943, at *8 n.2. The court presumably was referring to the jurisdictional objections raised in the arbitration respondents' renewed motion for summary disposition. However, the arbitration respondents' May 17, 2019, response expressly challenged arbitral jurisdiction over Superdeporte as to New Balance's claim for breach of the Distribution Agreement. This initial jurisdictional objection was therefore raised before discovery concluded in November 2019.

- 27 -

premised on the timing of the objection, we now consider the significance for the waiver analysis of Superdeporte's December 2019 assertion, with PSG, of two counterclaims alleging that New Balance breached the New Agreement and, alternatively, that New Balance acted in bad faith during contract negotiations. Specifically, we consider whether, by filing these counterclaims without specifically renewing its jurisdictional objection, Superdeporte abandoned the earlier objection and thereby waived its right to challenge the arbitrator's jurisdiction before a judicial forum.

"A jurisdictional objection, once stated, remains preserved for judicial review absent a clear and unequivocal waiver." Kaplan, 19 F.3d at 1510; see also Nat'l Ass'n of Broad. Emps. & Technicians v. Am. Broad. Co., 140 F.3d 459, 462 (2d Cir. 1998). An objection to the arbitral forum therefore will not be deemed abandoned unless and until the party making the objection "clearly indicate[s] [its] willingness to forego judicial review." Kaplan, 19 F.3d at 1510 (quoting Pa. Power, 886 F.2d at 50). Accordingly, Superdeporte would only have abandoned its earlier jurisdictional objection by asserting the counterclaims if bringing those counterclaims was a clear signal of its willingness to withdraw its challenge to arbitral jurisdiction.

In considering the clarity of the signal, it is crucial to understand the background to the decision by PSG and

Superdeporte to arbitrate the Peru Claims as counterclaims.  Before Superdeporte was added as a respondent in the arbitration, New Balance had sought to compel PSG and Ribadeneira to arbitrate the Peru Claims.  The response opposing New Balance's motion urged not only that the Peruvian court had exclusive jurisdiction over the Peru Claims but also specifically denied that Superdeporte was obligated to arbitrate the Peru Claims because it was not a signatory to the New Agreement and hence was not bound by its arbitration clause.  Over this opposition, the arbitrator allowed New Balance's motion to compel arbitration.

This background suggests that Superdeporte may have filed the two counterclaims only reluctantly and protectively, in light of the arbitrator's ruling that the Peru Claims were arbitrable.  As such, the decision to file the counterclaims does not clearly signal an intention to submit to the arbitrator's jurisdiction and abandon its earlier objection.[11]  Superdeporte did not, therefore, waive its right to judicial review of its challenge to arbitral jurisdiction by abandoning the jurisdictional objection that it first pressed in May 2019.

---

[11] We have similarly recognized, outside the arbitration context, that where a party with a preserved jurisdictional defense puts forward a counterclaim only "as a conditional position" that "will not be independently pressed if the primary action is dismissed for lack of . . . jurisdiction," this alternatively pleaded counterclaim does not undercut the jurisdictional defense. See Gen. Contracting & Trading Co. v. Interpole, Inc., 940 F.2d 20, 25 (1st Cir. 1991).

We turn now to the substance of appellees' jurisdictional challenge to the arbitrator's awards. Appellees sought vacatur under Section 10(a)(4) of the FAA, which authorizes a court to vacate an arbitration award "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). They contended, and the district court agreed, that the arbitrator exceeded his authority by exercising jurisdiction over them.

## A.  Standard of Review

When considering a district court's decision to confirm or vacate an arbitration award, "we review questions of law de novo and questions of fact for clear error." In re Vital Basics Inc., 472 F.3d 12, 16 (1st Cir. 2006). But to the extent that the district court "neither conducted an evidentiary hearing nor made findings of fact, our review is de novo." First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d 7, 11 (1st Cir. 2015); see also Coady v. Ashcraft & Gerel, 223 F.3d 1, 10 (1st Cir. 2000). Because here the district court relied on facts "taken from the parties' submissions and the documents cited therein," Ribadeneira, 2021 WL 4419943, at *1, we apply de novo review.[12]

---

[12] This approach comports with the rationale the Supreme Court cited for its holding that "courts of appeals should apply ordinary, not special, standards when reviewing district court decisions upholding arbitration awards," First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 948 (1995), namely that "the reviewing attitude that a court of appeals takes toward a district

Where a party challenges an arbitration award based on the arbitrator's resolution of the merits of the underlying dispute, we conduct our de novo review of the district court's decision "with great circumspection," Hoolahan v. IBC Advanced Alloys Corp., 947 F.3d 101, 111 (1st Cir. 2020), "mindful that the district court's review of arbitral awards must be 'extremely narrow and exceedingly deferential,'" Bull HN Info. Sys. v. Hutson, 229 F.3d 321, 330 (1st Cir. 2000) (quoting Wheelabrator Envirotech Operating Servs. Inc. v. Mass. Laborers Dist. Council Loc. 1144, 88 F.3d 40, 43 (1st Cir. 1996)). In these circumstances, a federal court "do[es] not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of the award." Hoolahan, 947 F.3d at 111 (quoting Asociación de Empleados del E.L.A. v. Unión Internacional de Trabajadores de la Industria de Automóviles, 559 F.3d 44, 47 (1st Cir. 2009)). By agreeing to have their disputes settled by an arbitrator, the parties to a contract with an arbitration clause agree to accept "the arbitrator's view of the facts and of the meaning of the contract." Hutson, 229 F.3d at 330 (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 37-38 (1987)).

court decision should depend upon 'the respective institutional advantages of trial and appellate courts,'" id. (quoting Salve Regina Coll. v. Russell, 499 U.S. 225, 233 (1991)). In deriving the factual background to its rulings from the parties' submissions and the arbitration record, the district court had no special institutional advantage with respect to establishing the facts.

By contrast, where a party challenges an arbitration award by attacking the arbitrator's jurisdiction, the "question[s] of arbitrability" at issue "are presumptively for courts to decide." Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 n.2 (2013). This presumption is overcome only if the parties agreed "by 'clear and unmistakable' evidence" to have an arbitrator decide questions of arbitrability in addition to the merits of their disputes. Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 530 (2019) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). Here, the district court concluded -- a conclusion New Balance does not challenge on appeal -- that Ribadeneira and Superdeporte "did not clearly and unmistakably agree to arbitrate arbitrability." Ribadeneira, 2021 WL 4419943, at *10. The district court accordingly reviewed the arbitrator's determinations regarding his own jurisdiction de novo. See Sutter, 569 U.S. at 569 n.2. We likewise determine the scope of the arbitrator's jurisdiction "independently," First Options, 514 U.S. at 943, even as our analysis is "informed" by the arbitrator's determinations in his own analysis of his jurisdiction, Solvay Pharms., Inc. v. Duramed Pharms., Inc., 442 F.3d 471, 477 (6th Cir. 2006) (citing Mobil Oil Corp. v. Loc. 8-766, 600 F.2d 322, 325 (1st Cir. 1979)).

**B. Legal Principles**

As the parties agree, Massachusetts law governs the question whether the arbitrator properly exercised jurisdiction over appellees.[13]   In general, Massachusetts law recognizes that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  Loc. Union No. 1710, Int'l Ass'n of Fire Fighters v. City of Chicopee, 721 N.E.2d 378, 381 (Mass. 1999), abrogated on other grounds by Mass. Highway Dep't v. Perini Corp., 828 N.E.2d 34 (Mass. 2005) (quoting AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 648 (1986)).  Nevertheless, arbitral jurisdiction is "not limited to those who have signed an arbitration agreement." Walker v. Collyer, 9 N.E.3d 854, 861 (Mass. App. Ct. 2014) (citing Thomson-CSF, S.A., v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)).  Following case law developed in the federal courts, Massachusetts courts have identified six theories under which nonsignatories may be bound by the arbitration agreements of

---

[13] We held supra that, despite the choice-of-law provisions in Sections 20 and 21 of the Distribution Agreement specifying the applicability of Massachusetts law, federal law rather than Massachusetts law governs procedural issues in the judicial review of the arbitrator's awards because those provisions were insufficient to displace the default FAA regime for enforcement of arbitration awards.  Here, by contrast, the question is what law applies to determine whether the arbitrator properly exercised jurisdiction; that question was a "matter[] in dispute" before the arbitrator that, according to Section 21, must be decided "in accordance with the laws of the Commonwealth of Massachusetts."

- 33 -

others: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." Machado v. System4 LLC, 28 N.E.3d 401, 408 (Mass. 2015) (footnotes and citations omitted); see also Walker, 9 N.E.3d at 861 (citations omitted).

New Balance argues that the arbitrator's exercise of jurisdiction over appellees was supportable under theories of assumption and equitable estoppel. We explain these theories before turning to examine how they apply in the instant case.

## 1. Assumption

In Machado, the Massachusetts Supreme Judicial Court ("SJC") recognized that "'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate,' despite being a non-signatory." 28 N.E.3d at 408 n.10 (quoting Thomson-CSF, 64 F.3d at 777). Apart from acknowledging assumption as one potential source of arbitral jurisdiction over a nonsignatory of an arbitration agreement, however, the SJC and Massachusetts courts more generally have not addressed the theory in great depth. Mindful that Massachusetts courts have considered it "appropriate to give strong weight to decisions in other jurisdictions" in examining when a signatory to an arbitration agreement can compel a nonsignatory to arbitrate, Walker, 9 N.E.3d at 859 (quoting O'Brien v. Hanover Ins. Co., 692

N.E.2d 39, 44 (Mass. 1998)), we look beyond Massachusetts case law for guidance.

We note that federal courts have applied the assumption theory in at least two sets of circumstances. First, where a nonsignatory to a contract with an arbitration clause is the successor-in-interest to an entity that was a party, the nonsignatory assumes its predecessor's obligation to arbitrate. For example, where a nonsignatory to a licensing agreement containing an arbitration clause merged with, and then dissolved, a licensee, the nonsignatory was deemed to have "voluntarily assumed" the obligations of the agreement as the signatory licensee's "successor," including the obligation to arbitrate. Fyrnetics (H.K.) Ltd. v. Quantum Grp., Inc., 293 F.3d 1023, 1029 (7th Cir. 2002). The court insisted that the nonsignatory successor entity could not "escape application of the license agreement's arbitration agreement by effectively legislating [the licensee] out of existence." Id. Similarly, where one broker-dealer acquired from another broker-dealer customer accounts governed by client agreements containing arbitration clauses, the court explained that the acquiring broker-dealer "can be held to have assumed the predecessor's liabilities" -- including the obligation to arbitrate as a nonsignatory of the client agreements -- if there was a "'de facto merger' of the two entities" or "a 'mere continuance' of the predecessor by the successor," such that

the acquiring broker-dealer was the "successor-in-interest" to the predecessor broker-dealer. Ryan, Beck & Co. v. Fakih, 268 F. Supp. 2d 210, 229-30 (E.D.N.Y. 2003).[14]

Second, where a nonsignatory is assigned rights under a contract containing an arbitration clause, the assignee assumes the obligation to arbitrate under that clause. See Fisser v. Int'l Bank, 282 F.2d 231, 233 n.6 (2d. Cir. 1960) ("[A]ssignees of contracts containing arbitration provisions may become parties to such provisions." (citations omitted)); cf. GMAC Com. Credit LLC v. Springs Indus., Inc., 171 F. Supp. 2d 209, 214 (S.D.N.Y. 2001)

_____

[14] The court in Ryan, Beck seemed to treat the theory that a successor-in-interest assumes the predecessor entity's obligation to arbitrate as distinct from the traditional assumption theory, describing that theory as a principle that it was recognizing "[i]n addition" to the assumption and estoppel theories. 268 F. Supp. 2d at 229. Here, by contrast, we treat the successor-in-interest theory as a form of assumption, rather than as an additional exception to the rule that nonsignatories are not bound to arbitrate. But even if we were to classify the successor-in-interest theory as distinct from the assumption theory, we think Massachusetts courts would not hesitate to treat successor liability as a basis for binding nonsignatories to an arbitration agreement. While Massachusetts courts have expressly recognized six traditional theories for binding nonsignatories to arbitration agreements, they have not treated this as an exhaustive list. See Machado, 28 N.E.3d at 408; Walker, 9 N.E.3d at 861. Moreover, the federal cases cited by the Machado and Walker courts expressly indicate that the various theories for binding nonsignatories to arbitration reflect traditional principles of contract and agency law. See, e.g., E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195 (3d Cir. 2001); Thomson-CSF, 64 F.3d at 776; Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 (5th Cir. 2003). The principle that a successor-in-interest is liable for the obligations of its predecessor is such a traditional principle of agency and corporate law. Ryan, Beck, 268 F. Supp. 2d at 229.

(holding that, under the Uniform Commercial Code, where an assignee is assigned rights under a contract, the "assignee suing on an assigned contract is bound by that contract's arbitration clause unless it secured a waiver").  This rule follows from "the basic principle that an assignee . . . whose rights are premised on a contract is bound by the remedial provisions bargained for between the original parties to the contract."  Banque de Paris et des Pays-Bas v. Amoco Oil Co., 573 F. Supp. 1464, 1469 (S.D.N.Y. 1983).  Otherwise, an arbitration clause "would be of no value," since "a party 'could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third party.'"  Id. at 1470 (quoting Hosiery Mfrs.' Corp. v. Goldston, 143 N.E. 779, 780 (N.Y. 1924)).

### 2. Equitable Estoppel

Drawing on the Second Circuit's articulation of the "direct benefits estoppel" theory, the Massachusetts Appeals Court recognized that a signatory may estop a nonsignatory from avoiding arbitration where the nonsignatory has "knowingly exploit[ed] an agreement with an arbitration clause," such as by "'knowingly accept[ing] the benefits' of such an agreement," provided the benefits at issue were "direct."  Walker, 9 N.E.3d at 861-62 (quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001)).  Benefits are "direct" when they "flow[] directly from the agreement," while "indirect" benefits

- 37 -

arise from "exploit[ing] the contractual relation of parties to an agreement" but not "the agreement itself." Id. at 862 (quoting MAG Portfolio, 268 F.3d at 61).

Federal courts in a number of other circuits, applying federal common law, have endorsed and further expounded on the direct benefits theory of equitable estoppel. For example, the Third Circuit held that nonsignatories who, "during the life of [a contract containing an arbitration clause], have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract," may be estopped from avoiding the obligation to arbitrate under that clause. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir. 2001), quoted with approval in InterGen N.V. v. Grina, 344 F.3d 134, 146 (1st Cir. 2003). See also Noble Drilling Servs., Inc. v. Certex USA, Inc., 620 F.3d 469, 473-74 (5th Cir. 2010); Hellenic Inv. Fund, Inc. v. Det Norske Veritas, 464 F.3d 514, 517-18 (5th Cir. 2006).

Applying the direct benefits theory of equitable estoppel, these courts have recognized specifically that a nonsignatory is estopped from avoiding the obligation to arbitrate under a contract's arbitration clause when the nonsignatory brings a claim under the contract. See, e.g., Noble Drilling, 620 F.3d at 473 (explaining that direct benefit estoppel applies when a

nonsignatory to a contract with an arbitration clause "seek[s] to enforce the terms of that contract or assert[s] claims that must be determined by reference to that contract"); Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000) ("In the arbitration context, . . . a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.").

## C.  Application

The district court concluded that the assumption and equitable estoppel theories provide no basis for arbitral jurisdiction over Superdeporte and Ribadeneira.  On de novo review, we reach a different conclusion.

### 1. Jurisdiction over Superdeporte

New Balance relies on both an assumption theory and an equitable estoppel theory to argue that the arbitrator properly exercised jurisdiction over Superdeporte as to New Balance's claims for breach of the Distribution Agreement and for tortious interference, and as to Superdeporte's own counterclaims.  Because we conclude that the assumption theory, standing alone, provides sufficient support for the arbitrator's exercise of jurisdiction over Superdeporte, we do not address the applicability of the direct benefits estoppel theory.

### (a) Assumption

New Balance argues that Superdeporte was subject to the arbitrator's jurisdiction because, as PSG's successor-in-interest, it assumed an obligation to arbitrate under the arbitration clause contained in the original Distribution Agreement.

Relying on Thomson-CSF, the district court rejected New Balance's argument. In Thomson-CSF, 64 F.3d at 777, the Second Circuit remarked that where a nonsignatory "explicitly disavowed any obligations arising out of" a contract with an arbitration clause, it cannot be held to have assumed the obligation to arbitrate under that clause. Noting Superdeporte's repeated objections to arbitral jurisdiction, the district court determined that Superdeporte had not assumed any duty to arbitrate, regardless of whether it was PSG's successor-in-interest.

We cannot agree with the district court's interpretation of Thomson-CSF. To be sure, in determining whether a nonsignatory corporate parent had assumed the obligation to arbitrate with a supplier under a contract concluded between its subsidiary and the supplier, the Thomson-CSF court looked to whether the nonsignatory corporate parent's conduct "manifest[ed] an intention to be bound" by the contract. Id. However, the court's inquiry was into the nonsignatory's entire course of conduct relating to the contract at issue, including its conduct before arbitration proceedings commenced. The Thomson-CSF court highlighted the fact that, even

before the nonsignatory corporate parent acquired the signatory subsidiary, the corporate parent had "explicitly informed" the supplier that it was "not adopting the [contract]" and "did not consider itself bound" by it. Id. at 775. Thomson-CSF therefore does not support the district court's view that Superdeporte's post hoc objections to jurisdiction, made during arbitration and litigation, were sufficient to definitively negate New Balance's contention that Superdeporte had assumed an obligation to arbitrate under the Distribution Agreement as PSG's successor-in-interest.

We therefore consider whether Superdeporte was liable for PSG's obligations under the Distribution Agreement as its successor-in-interest and thereby became bound by the agreement's arbitration clause.

As a general rule, Massachusetts law counsels against imposing the liabilities of a corporation on its successor. See Smith v. Kelley, 139 N.E.3d 314, 322 (Mass. 2020). However, where there is a "reorganization transforming a single company from one corporate entity into another," Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 255 (Mass. 2008) (quoting McCarthy v. Litton Indus., Inc., 570 N.E.2d 1008, 1012 (Mass. 1991)), successor liability may be imposed if "the entity remains essentially the same, despite a formalistic change of name or of corporate form," such that the successor entity is a "mere continuation of its

predecessor," Kelley, 139 N.E.3d at 323. To determine whether an entity is such a "mere continuation," Massachusetts courts examine "the continuity or discontinuity of the ownership, officers, directors, stockholders, management, personnel, assets, and operations of the two entities." Id. They also look to whether, after the reorganization, only one entity continues to exist. See Milliken, 887 N.E.2d at 255. In this "mere continuation" analysis, "no single factor is dispositive." Kelley, 139 N.E.3d at 323 (quoting Milliken, 887 N.E.2d at 255-56).

Here, almost all of these factors support the conclusion that Superdeporte was a "mere continuation" of PSG. The continuity of operations between PSG and Superdeporte is perhaps the most striking factor. It is undisputed that Superdeporte was created to take over PSG's role as New Balance's distributor in Peru. The arbitrator found, and the arbitration record confirms, that New Balance dealt with Superdeporte as its Peruvian distributor from May 2016, when Superdeporte became ready to begin operations.

This continuity of operations was matched by a substantial continuity of assets. The arbitration record discloses that PSG sold its entire inventory of New Balance products to Superdeporte, and that Superdeporte acquired PSG's intercompany debt as well as the right to use office premises

previously occupied by PSG.[15]  Moreover, while PSG was not dissolved, it is undisputed that it ceased distribution operations after selling its assets to Superdeporte.[16]

There was, in addition, substantial continuity of personnel and ownership between PSG and Superdeporte.  Ribadeneira himself testified during arbitration proceedings that he was the "ultimate owner" behind both entities.  As the arbitrator found, and appellees do not contest, Superdeporte also hired former PSG employees, and Ribadeneira exercised effective control of Superdeporte as he had done with PSG.

Of all these factors, it is mainly PSG's continued existence as a separate entity that weighs against a conclusion that Superdeporte was a "mere continuation" of PSG.  When taken together, however, the balance of the factors strongly supports the conclusion that Superdeporte was PSG's successor-in-interest.  Consequently, we deem Superdeporte to have assumed PSG's

---

[15] Contrary to appellees' assertion, this sale of assets satisfied the "prerequisite to successor liability," that there be "a transfer of all, or substantially all, assets from predecessor to successor."  Premier Cap., LLC v. KMZ, Inc., 984 N.E.2d 286, 292 (Mass. 2013) (emphasis added) (first quoting Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1448 (1st Cir. 1995), then quoting Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc., 98 F.3d 262, 266 (7th Cir. 1996)).

[16] Evidence in the arbitration record reveals that, having been stripped of its assets, PSG was then transferred to a new owner outside the retail group owned by Ribadeneira.

obligation to arbitrate under the arbitration clause in the Distribution Agreement.

**(b) Scope of the Distribution Agreement's Arbitration Clause**

Having concluded that, as a "mere continuation" of PSG and hence its successor-in-interest, Superdeporte assumed the obligation to arbitrate under the Distribution Agreement's arbitration clause, we now examine what claims are arbitrable under that clause, which encompasses "any and all disputes (whether in contract or any other theories of recovery) related to or arising out of" the Distribution Agreement, or that are related to or arise out of "the relationship" between the parties to that contract, namely New Balance and PSG. We specifically seek to determine, as an exercise in contract interpretation, whether the arbitration clause covers those claims and counterclaims resolved by the arbitrator in which Superdeporte either was found liable or had itself sought relief: New Balance's breach of contract claim and tortious interference claim, and the two counterclaims that Superdeporte, joining with PSG, filed.

We begin by considering the claim brought by New Balance alleging breach of the Distribution Agreement, for which the arbitrator held Superdeporte jointly liable. The Distribution Agreement's arbitration clause binds to arbitration all disputes "related to or arising out of" the contract. Since a claim for breach of the Distribution Agreement is undoubtedly a dispute

arising out of that agreement, New Balance's claim is clearly arbitrable under the Distribution Agreement's arbitration clause. Having assumed PSG's obligation to arbitrate under that clause, Superdeporte was required to arbitrate the claim.

We consider next whether Superdeporte's two counterclaims are encompassed by the Distribution Agreement's arbitration clause. The first counterclaim alleged that New Balance had breached the New Agreement -- an agreement designed to continue, albeit in a different form, the business relationship between PSG and New Balance in Peru. As such, it is a dispute "related to or arising out of" the "relationship" between New Balance and PSG. The second counterclaim alleged that New Balance had acted in bad faith during the negotiations seeking to extend the relationship between PSG and New Balance. Disputes related to or arising out of the breakdown of the relationship between New Balance and PSG are disputes "related to or arising out of" their "relationship." See Next Step Med. Co. v. Johnson & Johnson Int'l, 619 F.3d 67, 72 (1st Cir. 2010) (holding that an arbitration clause covering disputes "arising out of or relating in any way to" the "business relationship" between the parties encompassed a tort claim relating to the "breakdown" of that relationship). Since both of Superdeporte's counterclaims related to or arose out of the relationship -- and its breakdown -- between PSG and New Balance, they come within the scope of the Distribution Agreement's

arbitration clause. Given that Superdeporte assumed the obligation to arbitrate under that clause as PSG's successor-in-interest, the arbitrator's exercise of jurisdiction to rule on Superdeporte's counterclaims was therefore proper.

We turn next to New Balance's tortious interference claim as against Superdeporte, for which the arbitrator held Superdeporte (and PSG) jointly liable with Ribadeneira due to the assignment by Superdeporte (and PSG) of the Peru Claims to Ribadeneira. But it is not the question of Superdeporte's liability on the tortious interference claim that is before us.[17] Our inquiry is into whether Superdeporte was required to submit to the arbitrator's resolution of that claim. Specifically, we ask whether the tortious interference claim is encompassed by the Distribution Agreement's arbitration clause, to which Superdeporte is bound as PSG's successor-in-interest.

In answering that question of arbitrability, we note at the outset that the broad language of the Distribution Agreement's arbitration clause, covering "any and all" disputes "whether in contract or any other theories of recovery," embraces not only

_____

[17] In seeking vacatur of the arbitrator's awards, Superdeporte has not challenged the arbitrator's determination of liability on the merits of the tortious interference claim -- or any other claim -- but only the arbitrator's jurisdiction.

contract-based claims but also tort claims such as a tortious interference claim.

Here, the tortious interference alleged was Ribadeneira's pursuit of the Peru injunction by improper means. This injunction was granted by the Peruvian court as relief for the Peru Claims. As we explained in discussing the arbitrability of Superdeporte's counterclaims, which asserted what were essentially the Peru Claims in the arbitration, these claims are disputes "related to or arising out of" the "relationship" between the parties to the Distribution Agreement. The first claim, alleging that New Balance breached the New Agreement, was a claim "arising out of" a contract that would have formalized the continuation of New Balance and PSG's distribution "relationship" in Peru. The second claim, alleging bad faith by New Balance in contract negotiations, "related to" the breakdown of the "relationship" between New Balance and PSG.

Since the Peru Claims were disputes "related to or arising out of" the "relationship" between New Balance and PSG, the tortious interference claim alleging that Ribadeneira improperly obtained the Peru injunction as relief for those same Peru Claims is also fairly describable as a dispute "related to or arising out of" the "relationship" between New Balance and PSG. The tortious interference claim is therefore encompassed by the

Distribution Agreement's arbitration clause.[18]  As PSG's successor-in-interest, Superdeporte assumed the obligation to arbitrate under that clause and, accordingly, it was bound to arbitrate the tortious interference claim.

### 2. Jurisdiction over Ribadeneira

New Balance's arguments that Ribadeneira was bound to arbitrate its tortious interference claim rely again on the assumption and equitable estoppel theories.  New Balance invoked an assumption theory in contending that when Ribadeneira was assigned PSG and Superderporte's claims arising from the New Agreement and the negotiations surrounding it, he assumed the obligation to arbitrate under both the New Agreement and the original Distribution Agreement.  New Balance invoked an equitable estoppel theory in arguing that, because Ribadeneira brought suit in Peru alleging claims relating to the Distribution Agreement and New Agreement, he is estopped from escaping the obligation to arbitrate under the arbitration clauses of both contracts.[19]

---

[18] Our conclusion is strengthened by the presumption under Massachusetts law in favor of arbitrability where, as here, the arbitration clause is broadly worded.  See Carpenter v. Pomerantz, 634 N.E.2d 587, 589 (Mass. App. Ct. 1994) (holding that the broad language of an arbitration clause encompassing "[a]ny dispute arising out of or relating to this Agreement or the breach thereof" created a "strong presumption of arbitrability"); cf. Commonwealth v. Philip Morris Inc., 864 N.E.2d 505, 511 (Mass. 2007) ("[W]hen considering a broadly worded arbitration clause, there is a presumption that a contract dispute is encompassed by the clause unless it is clear that the dispute is excluded.").

[19] We understand New Balance to have invoked the equitable

The district court concluded that jurisdiction over Ribadeneira was unsupportable on these theories, for reasons that appellees echo on appeal. The court determined that the assumption theory could not justify arbitral jurisdiction over Ribadeneira because it interpreted the assignment agreements to have transferred only claims relating to the putative New Agreement, not the original Distribution Agreement. As such, any obligation to arbitrate that Ribadeneira assumed by the assignment agreements could only have been under the New Agreement, not the Distribution Agreement. But since the arbitrator found that the New Agreement never became an enforceable contract, Ribadeneira could not have assumed a binding obligation to arbitrate.

The district court also relied on its interpretation of the assignment agreements as transferring only rights under the New Agreement to conclude that the direct benefits estoppel theory failed to establish arbitral jurisdiction over Ribadeneira. Because Ribadeneira's lawsuit in the Peruvian courts asserted claims under the New Agreement only, the court reasoned, Ribadeneira only received a direct benefit from the New Agreement. He would therefore only be estopped from avoiding the New

estoppel theory for jurisdiction over Ribadeneira when it observed that "Ribadeneira . . . invoke[d] the Distribution Agreement and the putative [New Agreement] while trying to escape the arbitration clause," and then urged that Ribadeneira's "pick-and-choose strategy is unavailing."

Agreement's arbitration clause. But because the New Agreement is unenforceable, Ribadeneira could not have acquired an effective obligation to arbitrate by being estopped from avoiding the New Agreement's arbitration clause.

We disagree with the district court and appellees that equitable estoppel is powerless to impose an effective obligation on Ribadeneira to arbitrate under the New Agreement's arbitration clause. Because we conclude that principles of equitable estoppel are sufficient to bind Ribadeneira to arbitration under the New Agreement's arbitration clause, we do not consider the assumption theory that New Balance also presses.

**(a) Equitable Estoppel**

It is undisputed that Ribadeneira filed suit in Peru alleging that New Balance had breached the New Agreement. He thereby obtained an injunction against New Balance that lasted from December 2017 to July 2018. In this way, Ribadeneira sought to legally enforce -- and for well over half a year, succeeded in enforcing -- a claim under that contract. Because he sought to enforce the terms of the New Agreement, thereby knowingly receiving a direct benefit from that contract, we conclude that Ribadeneira was estopped from avoiding that putative contract's arbitration clause, despite his nonsignatory status. See Noble Drilling, 620 F.3d at 473; Int'l Paper, 206 F.3d at 418; Walker, 9 N.E.3d at 861-62.

To be sure, as emphasized by the district court and appellees, the arbitrator ruled that the New Agreement never became an enforceable contract. If so, then the New Agreement and its arbitration clause do not impose valid contractual obligations. But the unenforceability of the New Agreement as a matter of contract law does not preclude compelling Ribadeneira to abide by that agreement's arbitration clause by the application of equitable estoppel. After all, "[e]very modern instance of estoppel . . . is an illustration of equity's refusal to accept a legal outcome and of its power to change it." Andrew Kull, Equity's Atrophy, 97 Notre Dame L. Rev. 1801, 1803 (2022). Perhaps the clearest example of the equitable power of courts to impose an obligation in the absence of any contractual basis for that obligation is provided by the doctrine of promissory estoppel, where detrimental reliance -- without the consideration necessary for the formation of a valid contract -- can give rise to binding obligations.[20]

---

[20] As Massachusetts courts have recognized, in the absence of an enforceable contract, "promissory estoppel implies a contract . . . where there is proof of an unambiguous promise coupled with detrimental reliance by the promisee." Malden Police Patrolman's Ass'n v. Malden, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017) (citing R.I. Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1178 (Mass. 1995)). Notably, promissory estoppel does not apply where there is an enforceable contract. See id. at 1064 ("Where an enforceable contract exists, . . . a claim for promissory estoppel will not lie.").

In the arbitration context, equitable estoppel applies to prevent a nonsignatory from opportunistically adopting inconsistent stances toward a contract according to what would suit its advantage: a nonsignatory will be estopped from "embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." DuPont, 269 F.3d at 200. Here, Ribadeneira obtained the Peru injunction in his favor predicated on his claim that the New Agreement was a binding contract. We are persuaded that equitable estoppel applies here to prevent him, when challenging the arbitrator's jurisdiction, from maintaining that the contract was never executed, in direct contradiction to his earlier stance. See 18B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 4477 (3d ed. 1998) ("Absent any good explanation, a party shall not be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."); see generally In re Buscone, 61 F.4th 10 (1st Cir. 2023). Ribadeneira is estopped from denying that the New Agreement's arbitration clause is enforceable, just as he is estopped from asserting his nonsignatory status to avoid the obligation to arbitrate under that clause. Accordingly, he is obliged to abide by the New Agreement's arbitration clause, even if that putative contract was never executed.

**(b) Scope of the New Agreement's Arbitration Clause**

Having concluded that Ribadeneira is bound by the New Agreement's arbitration clause, we now examine whether that clause embraces the one claim as to which the arbitrator found him liable, namely New Balance's tortious interference claim. As we explained _supra_, the language in the New Agreement's arbitration clause is identical to that of the Distribution Agreement's arbitration clause. The New Agreement's arbitration clause therefore binds to arbitration "any and all disputes (whether in contract or any other theories of recovery) related to or arising out of" that putative contract or "the relationship" between the alleged parties to the agreement.

The misconduct underlying the tortious interference claim was Ribadeneira's seeking and obtaining of the Peru injunction based on misrepresentations. The Peruvian court granted the Peru injunction as relief for the Peru Claims, one of which alleged that New Balance had failed to perform its obligations under the New Agreement. The tortious interference claim is, for that reason, a dispute "related to or arising out of" the New Agreement. Accordingly, the claim was arbitrable under the New Agreement's arbitration clause. Being bound by equitable estoppel to abide by that clause, Ribadeneira was subject to the arbitrator's resolution of the tortious interference claim.

## IV.

We have concluded that the arbitrator properly exercised jurisdiction over both Ribadeneira and Superdeporte as to the various claims and counterclaims on which he ruled. The order of the district court vacating the arbitration awards for lack of arbitral jurisdiction is therefore reversed. We remand the case to the district court with instructions to grant New Balance's cross-motion to confirm the arbitrator's awards.

So ordered. Costs to appellant.

**APPENDIX**

| CLAIM / COUNTERCLAIM | PERUVIAN LITIGATION | | ARBITRATION | | | DISTRICT COURT |
|---|---|---|---|---|---|---|
| | Brought by | Against | Brought by | Against | RULINGS | RULINGS |
| **Breach of Distribution Agreement** | | | New Balance | PSG, Superdeporte, and Ribadeneira | PSG and Superdeporte liable | No arbitral jurisdiction over Superdeporte |
| **Tortious interference** | | | New Balance | PSG, Superdeporte, and Ribadeneira | PSG, Superdeporte, and Ribadeneira liable | No arbitral jurisdiction over Superdeporte and Ribadeneira |
| **Breach of New Agreement** | Ribadeneira, as assignee of PSG and Superdeporte | New Balance | PSG and Superdeporte (counter-claimants) | New Balance | New Balance not liable | No arbitral jurisdiction over Superdeporte |
| **Bad faith in contract negotiations** | Ribadeneira, as assignee of PSG and Superdeporte | New Balance | PSG and Superdeporte (counter-claimants) | New Balance | New Balance not liable | No arbitral jurisdiction over Superdeporte |